# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **STEVEN P. TENGOOD**, ) | |
| ) | |
| **Plaintiff**, ) | Civil Action No. _____ |
| ) | |
| **vs.** ) | |
| ) | **JURY TRIAL REQUESTED** |
| **CITY OF PHILADELPHIA**, a Pennsylvania ) | |
| Municipal Corporation, **THOMAS M.** ) | |
| **CONWAY**, in his capacity as an individual and ) | |
| in his official capacity as Deputy Managing ) | |
| Director - Philadelphia Managing Director's ) | |
| Office & Co-Director of the Community Life ) | |
| Improvement Program; **RYCHARDE** ) | |
| **SICINSKI** a/k/a RICK SICINSKI, in his ) | |
| capacity as an individual and in his official ) | |
| capacity as a Chief Code Enforcer - ) | |
| Philadelphia Department of Licenses & ) | |
| Inspections' Community Life Improvement ) | |
| Program; **MARTIN HIGGINS** a/k/a MARTY ) | |
| HIGGINS, in his capacity as an individual and ) | |
| in his official capacity as Inspector - ) | |
| Philadelphia Department of Licenses & ) | |
| Inspections' Community Life Improvement ) | |
| Program; **ROSEANNE ELIA**, in her capacity ) | |
| as an individual and in her official capacity as ) | |
| an Inspector - Philadelphia Department of ) | |
| Licenses & Inspections Community Life ) | |
| Improvement Program; **BEVERLY L. PENN**, ) | |
| in her capacity as an individual and in her ) | |
| official capacity as Deputy City Solicitor Code ) | |
| Enforcement Division, ) | |
| **Defendants**. ) | |

# CIVIL COMPLAINT
## TABLE OF CONTENTS

**Introduction**                                                                                    **2**

*Plaintiff* ..................................................................................................*2*

*Defendants* .......................................................................................................*2*

*Racketeer Influenced Corrupt Organizations* ........................................*5*

*Additional Federal Claims* .......................................................................*6*

*Pennsylvania Claims* .................................................................................*6*

*Prayer For Relief* .......................................................................................*6*

*Subject Matter Jurisdiction*.......................................................................*7*

*Personal Jurisdiction And Venue* .............................................................*7*

**The Offending Scheme And Its Components**                                    **8**

*The Overall Scheme* ...................................................................................*8*

*City's Departmental Structure & Managerial Hierarchy* .......................*9*

*Organizational Structure Of CLIP*...........................................................*10*

*CLIP's Policy Mandate And Operational Objectives* .............................*10*

*Defendants' Targeting Of Steven P. Tengood* ..........................................*11*

*The Neighborhood Transformation Initiative And The Federal Funding Of CLIP*12

*The Illicit Diversion Of Federal Funds* ...................................................*13*

*The Corruption Of Inspectors Sicinski And Elia* ...................................*14*

*The Targets - Excluding Mr. Tengood & 7219 Saul Street*....................*16*

*The Corruption Of Higgins And Targeting Mr. Tengood & 7219 Saul Street*.......*17*

*Mr. Tengood Is Forced To Move His Mother From The House* ............................*23*

*Mr. Tengood Fights Back* ..........................................................................*23*

*The Corruption Of The City Solicitor* ....................................................*24*

*The Administrative Review Phase*............................................................*24*

*The Civil Litigation Phase* .......................................................................*26*

*Defendants' Scheme Is Discovered And Finally Unravels* ...................*28*

*The Remaining Conspirators Scramble To Cover-Up Their Involvement* ...........*29*

*The City's Equity Suit Is Disposed* ............................................................*30*

*Mr. Tengood's L&I Appeal Is Affirmed* ..............................................*30*

**Claims For Relief**              **33**

**Declaration Of Good Faith**       **53**

**Appendix I**             **i**

# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN P. TENGOOD**, | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | Civil Action No. _____ |
| **vs.** | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| **CITY OF PHILADELPHIA**, a Pennsylvania Municipal Corporation, **THOMAS M. CONWAY**, in his capacity as an individual and in his official capacity as Deputy Managing Director - Philadelphia Managing Director's Office & Co-Director of the Community Life Improvement Program; **RYCHARDE SICINSKI** a/k/a RICK SICINSKI, in his capacity as an individual and in his official capacity as a Chief Code Enforcer - Philadelphia Department of Licenses & Inspections' Community Life Improvement Program; **MARTIN HIGGINS** a/k/a MARTY HIGGINS, in his capacity as an individual and in his official capacity as Inspector - Philadelphia Department of Licenses & Inspections' Community Life Improvement Program; **ROSEANNE ELIA**, in her capacity as an individual and in her official capacity as an Inspector - Philadelphia Department of Licenses & Inspections Community Life Improvement Program; **BEVERLY L. PENN**, in her capacity as an individual and in her official capacity as Deputy City Solicitor Code Enforcement Division, **Defendants**. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

## CIVIL COMPLAINT

Plaintiff Steven P. Tengood, by and through the undersigned attorney, and for his

Complaint against Defendants City of Philadelphia, Thomas M. Conway, Rycharde Sicinski a/k/a

Rick Sicinski, Martin Higgins a/k/a Marty Higgins, Roseanne Elia, and Beverly L. Penn, states as follows:

## I.  INTRODUCTION

### A.  RELEVANT TIMES:

1.     The times relevant to this Complaint are from on or about February 2004 through May 13, 2011, the date of the City's most recent notice of violation to Steven P. Tengood, and through and continuing to the filing of this Complaint (hereinafter as, the "Relevant Times").

### B.  PARTIES TO THIS ACTION:

#### *Plaintiff*

2.     Plaintiff Steven P. Tengood (hereinafter as, "Mr. Tengood") is an adult individual and resident of the Commonwealth of Pennsylvania, with his principle address located at 7219 Saul Street, Philadelphia, PA 19149.  Mr. Tengood is sixty two (62) years old, a graduate of Drexel University, and a retired civilian employee of both the United States Navy and Army.  Mr. Tengood was employed by the Navy for over twenty three (23) years and the Army for sixteen (16) months, respectively, as a logistics management specialist in the technical publications division.  Mr. Tengood has lived at 7219 Saul Street continuously for the past forty four (44) years.

#### *Defendants*

3.     Defendant City of Philadelphia (hereinafter as, the "City") is a municipal corporation of the first class, situated in the Commonwealth of Pennsylvania, with its principal place of business located at 1515 Arch Street, Philadelphia, PA 19102.  During the Relevant Times the City acted as a principal and/or through its agents, employees, and contractors, all of

whom represented themselves as acting in the course of their employment and within the scope of their authority, including but not limited to those individual Defendants identified in Paragraphs 4 through 8 of this Complaint.

4.     Defendant Thomas M. Conway (hereinafter as, "Conway") is an adult individual and resident of the Commonwealth of Pennsylvania, with his principle address located at 9336 Tulip Street, Philadelphia, PA 19114.  During the Relevant Times Conway was employed by the City as a Deputy Managing Director in the Managing Directors' Office and/or The Mayor's Office of Community Service.   Conway was also co-director of the Community Life Improvement Program (hereinafter as "CLIP") and was ultimately responsible for the training, supervision, and conduct of defendants Rycharde Sincinski, Martin Higgins, and Roseanne Elia. Conway is further responsible by law, including but not limited to the provisions of the Philadelphia Home Rule Charter, for enforcing the regulations of the City and for ensuring that City inspectors and clean up crews working within its departments obey the laws of the Commonwealth of Pennsylvania and the United States of America. Conway is an associate of the City, Martin Higgins, Rycharde Sicinski, Roseanne Elia, and Beverly L. Penn.

5.     Defendant Rychard Sicinski a/k/a Rick Sicinski (hereinafter as, "Sicinski") is an adult individual and resident of the Commonwealth of Pennsylvania, with his principle address located at 9312 Germania Street, Philadelphia, PA 19114.  During the Relevant Times Sicinski was employed by the City as a chief inspector and/or chief code enforcer with CLIP.  During the Relevant Times, Sicinski  was, therefore, also responsible for the training, supervision, and conduct of defendants Martin Higgins, and Roseanne Elia.  Sicinski recently pled guilty to multiple felony charges including: receiving stolen property; criminal trespass; official oppression; and burglary, before the Court of Common Pleas of Philadelphia County, as a result

of his malfeasance while working for the City. *Commonwealth v. Sicinski*, No. CP-51-CR-0001173-2010 (Ct. Com. Pl. Phila. County Jan. 29, 2010).  A true and correct copy of Docket No. CP-51-CR-0001173-2010 is incorporated herein and attached here to as Exhibit "A".  Sicinski is an associate of the City, Conway, Martin Higgins, Roseanne Elia, and Beverly L. Penn.

6.     Defendant Martin Higgins a/k/a Marty Higgins (hereinafter as, "Higgins") is an adult individual and resident of the Commonwealth of Pennsylvania, with his principle residence located at 1122 Wakeling Street, Philadelphia, PA 19124.  During the Relevant Times, Higgins was employed by the City as an inspector with CLIP.  Higgins is an associate of the City, Conway, Sicinski, Roseanne Elia, and Beverly L. Penn.

7.     Defendant Roseanne Elia (hereinafter as, "Elia") is an adult individual and resident of the Commonwealth of Pennsylvania, with her principle residence located at 8424 Algon Avenue, Philadelphia, PA 19152.  During the Relevant Times Elia was employed by the City as an inspector with CLIP.  Elia is an associate of the City, Conway, Sicinski, Higgins, and Beverly L. Penn.

8.     Defendant Beverly L. Penn (hereinafter as, the "City Solicitor") is an adult individual and resident of the Commonwealth of Pennsylvania, with her principle residence located at 6655 McCallum Street, Apt. 213E, Philadelphia, PA 19119.  During the Relevant Times the City Solicitor was employed by the City as a Deputy City Solicitor with the Code Enforcement Division.  The City Solicitor is an associate of the City, Conway, Sicinski, Higgins, and Elia.

**C.  NATURE OF THE ACTION:**

*Racketeer Influenced Corrupt Organizations*

9.      This Complaint arises from, inter alia, defendants' violations of The Organized Crime Control Act of 1970, Pub. L. No. 91-452, Section 901(a), 84 Stat. 941, Racketeer Influenced and Corrupt Organizations (hereinafter as, "RICO"), and is brought by Steven P. Tengood in connection with a scheme devised, conducted, and/or participated in by the named Defendants, intended to defraud, intimidate, and ultimately steal money and/or property from Mr. Tengood.   The scheme relied upon and was facilitated by the misappropriation of federal, state, and municipal funds and equipment, including tools, cameras, vehicles and other general inventory, and was effected, directly or indirectly, by making use of the means and instruments of transportation and communication in interstate commerce, including the United States' Mails.

10.      In carrying out the scheme to defraud Mr. Tengood, Defendants engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud and conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1349 respectively, by transmitting and causing to be transmitted writings, signs, and signals, by means of the United States Postal Service, for the purposes of executing the scheme and artifice to defraud; violation of 18 U.S.C. § 1951 for obstructing the movement of goods in commerce by extortion; and violation of 18 U.S.C. § 1513 (b) for retaliating against a witness or victim for attendance at an official proceeding by damaging that person's tangible property.

11.      In carrying out the scheme to defraud Mr. Tengood, Defendants also engaged, *inter alia*, in conduct in violation of the laws of the Commonwealth of Pennsylvania, to wit: theft by unlawful taking or disposition of property in violation of 18 Pa. C.S. § 3921; theft by

deception in violation 18 Pa. C.S. § 3922; and theft by extortion in violation of 18 Pa. C.S. § 3923.

### *Additional Federal Claims*

12.     This Complaint also alleges: (i) violations of the Civil Rights Act of 1964, 42 U.S.C. § 1983, for deprivation of rights, including violations of Mr. Tengood's substantive and procedural due process rights articulated in the 4th Amendment and incorporated in the Due Process Clause of the 14th Amendment to the United States Constitution, by Defendants, for unlawful entry upon private property and the unlawful seizure of personal possessions; and (ii) in the alternative, violation of the American's With Disabilities Act of 1990, 126 U.S.C. § 12132, by Defendants, for discrimination against a disabled citizen in conjunction with the administration of a federally funded program.

### *Pennsylvania Claims*

13.     This complaint further alleges State claims for: (iii) common law Negligence based on the Defendants' failure to act with appropriate care in the execution of their official duties, consistent with, among others, the standards set forth in the Philadelphia Home Rule Charter; (iv) common law Conversion for the intentional and unprivileged dispossession of personal property; (v) common law Trespass for the intentional and unprivileged intrusion on private land; (vi) common law Invasion of Privacy for tortious intrusion into a place of seclusion and investigation of private concerns; and (viii) claims for Malicious Prosecution in violation of the Dragonetti Act, 42 Pa. C.S. § 8351 *et seq*., all to the party named for purposes of relief.

### *Prayer for Relief*

14.     Plaintiff Steven P. Tengood seeks actual damages in excess of $25,000, compensatory damages in excess of $50,000,  punitive damages in excess of $250,000, plus

treble damages arising  under the RICO claims, and restrictions upon Defendants' future conduct, together with costs of investigation and suit, attorney's fees, and interest.  Plaintiff thus seeks a recovery of damages from Defendants in excess of $925,000.

### D.  FEDERAL JURISDICTION:

#### *Subject Matter Jurisdiction*

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (Federal Question); claims for relief under 18 U.S.C. §§ 1964(a) (Equity) and 1964(c) (Right to Sue and Treble Damages); 42 U.S.C. § 1983 and § 1985 (Civil Action for Deprivation of Rights); 42 U.S.C. § 12133 (Civil Action for Disability Discrimination in Connection with a federally funded program) and violations of the 4th Amendment to the United States Constitution , as incorporated by the due process clause of the 14th Amendment, for unlawful search and seizure.

16.     This Court has supplemental jurisdiction over the subject matter of the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

#### *Personal Jurisdiction and Venue*

17.     Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b) and (c), since the Defendants are either residents of, have an agent or agents, or transact their affairs in, the Eastern District of Pennsylvania, the acts and occurrences in furtherance of the claims alleged herein arose in the Eastern District of Pennsylvania, and because the ends of justice require that other parties residing in other districts be brought before this Court.

## II.  THE OFFENDING SCHEME AND ITS COMPONENTS

**A.  GENERAL ALLEGATIONS:**

### *The Overall Scheme*

18.     The scheme to defraud Mr. Tengood was part of a broader criminal conspiracy engaged in by Defendants that targeted elderly or otherwise vulnerable citizens of Philadelphia. The scheme was comprehensive in scope and specifically designed to intimidate, rob, and/or extort money and property from select residents of the northeast section of the City.

19.     Over the course of several years, during the Relevant Times, the Defendants conspired to, and did, enter at least six private residences (excluding Mr. Tengood's residence) under the fraudulent pretenses of needing to clear the homes of various code violations.  These violations were served together with fraudulent or inflated bills for municipal services deemed necessary to remedy the violations.

20.     Entrance to these homes proceeded in each instance without the owners' consent and/or without legal authority.  Once inside the homes, the conspirators systematically stole items of value from the premises.  In the most egregious instances City trucks were actually driven to the target homes and their contents removed *en masse*: televisions; dining room furniture sets; floor safes; silver flatware settings; clothing; family heirlooms; and several large gun collections. Presentment at 2, *In Re County Investigating Grand Jury XXIII*, No. 000901-2008 (Ct. Com. Pl. Phila. County Dec. 15, 2009).  A true and correct copy of the Presentment is incorporated herein and attached hereto as Exhibit "B".

21.     The scheme was facilitated, at least in part, through the misappropriation of federal funding, together with other items of general City inventory, that had been allocated as part of an anti-blight policy initiative being implemented in Philadelphia's most distressed

neighborhoods.  These funds and physical resources all passed within the stream of or otherwise

had a substantial connection to interstate commerce.

### City's Departmental Structure & Managerial Hierarchy

22.    The scheme was participated in by a number of City departments and sub-
departments, together with individual employees of the City, ranking from lower level
inspectors, to program managers, and up through to the executive tier in the Managing
Directors' Office -- including the individual Defendants identified in Paragraphs 4 through 8
above.

23.    The participant departments and sub-departments included the City's: Department
of Licenses & Inspections (hereinafter as L&I), Department of Streets (hereinafter as "Streets"),
Mayor's Office of Community Services (hereinafter as, "Community Services"), Solicitors'
Office, and CLIP -- each of which was ultimately overseen by the Managing Directors' Office
(hereinafter as, the "MDO").  These departments and sub-departments exist under the authority
of and are governed by, *inter alia*, the Philadelphia Home Rule Charter.

24.    CLIP was/is situated somewhere between L&I, Streets, and the MDO, drawing
resources from each as necessary to carryout its operational objectives.   Therefore, CLIP
functioned as the logistical nexus for the various departments and individuals participating in the
scheme.  Moreover, CLIP and its inspectors succeeded as the principal conduit through which the
Defendants were able to directly perpetrate  their scheme against Mr. Tengood.

25.    Participation  in  the  overall  scheme  has  so  far  resulted  in  at  least  nine  felony
convictions  (including  Rycharde  Sicinski)  by  the  Philadelphia  District  Attorney  on  charges
including: conspiracy, perjury, theft, corrupt organizations, and illegal trafficking in firearms.

*Organizational Structure of CLIP*

26.    Notwithstanding the inter-departmental cooperation described in Paragraphs 22 and 23 above, CLIP maintained its own dedicated staff of inspectors, code enforcers, and clean-up crews during the Relevant Times described herein.

27.    CLIP employees are all City employees assigned to the initiative by the Department of Licenses Inspections, the Mayor's Office of Community Services, or the Managing Director's Office.

28.    In particular, Deputy Managing Director Thomas Conway was employed as the chief overseer of CLIP and acted as an executive level liaison between CLIP, the Mayor's Office, and other top tier administrative agencies of the City.  Rycharde Sicinski was employed by the City as CLIP's chief code enforcer and inspector in or about the years 2004 through December 2009.  During this time Sicinski was responsible for overseeing all CLIP staff and clean-up crew members, as well as administering and enforcing the program's policies and procedures.  During the Relevant Times, Martin Higgins and Roseanne Elia were also employed by the City as CLIP inspectors.  Higgins and Elia received direction from and reported to Sicinski in his capacity as chief code enforcer/inspector during the Relevant Times.

*CLIP's Policy Mandate and Operational Objectives*

29.    In April 2002, lead by Councilwoman Joan Krajewski, the City launched CLIP, a campaign to target "quality of life" code violations, such as graffiti, vandalism, and property neglect, as part of a broader policy agenda known as the Neighborhood Transformation Initiative (hereinafter as, the "NTI").

30.    CLIP was originally introduced in the City's 6th and 10th Council Districts (hereinafter as the, "Northeast") with plans for citywide expansion in future years.  CLIP's

mandate is to act as a quick response unit, giving violators twenty (20) days (or less, in so called "emergency" situations) to remediate property code violations after receiving written notice from CLIP inspectors.

31.   If a violator takes no action, CLIP crews are empowered to resolve the violation (i.e., cut high weeds back, remove trash, clean and seal the property) and then charge the property owner with a fine and fee for any remediation services performed.

32.   If the property owner does not pay the fine and fee, the amount is placed as a lien on the violator's property. Office of the Mayor, City of Philadelphia: *The Mayor's Operating Budget - Fiscal Year 2004* (2003).

33.   In extreme situations non-compliant property owners can be criminally charged and face jail time.

34.   CLIP action is triggered when a complaint comes into its office - sometimes from City Council members, sometimes from neighbors of the subject property, sometimes through referrals from the police, the fire department, or L&I. Presentment at 6.

35.   CLIP inspectors are not, however, charged with issuing fire code violations nor are they responsible for inspecting the interior of buildings.  Rather, CLIP members are charged with monitoring violations of the Property Maintenance Code relating to the exteriors of buildings, trash, and residential yards. *Id*. at 6 - 7.  In fact, following the criminal indictment of the CLIP conspirators, Mayor Nutter expressly proscribed CLIP's authority to regulate any aspect of the interior conditions of any property in the City.

### *Defendants' Targeting of Steven P. Tengood*

36.   In so far as the overall scheme directly targeted Mr. Tengood it involved a combination of the following conduct by Defendants: (i) the misappropriation of federal, state,

and city funds, equipment and general inventory in order to further the overall objectives of the scheme; (ii) the issuance of fraudulent or grossly inflated notices of municipal code violations, sent through the United States' Mail, as a means of intimidating Mr. Tengood  and forcing him to relinquish his personal property; (iii) reliance upon the aforementioned notices as a fraudulent basis for entry onto Mr. Tengood's private property and the seizure of his personal possessions situated thereon under the color of City authority, and to further threaten and intimidate him, in exchange for his eventually being left alone by Defendants; (iv) the issuance of fraudulent bills, sent through the United States' Mail, for services provided by the City of Philadelphia deemed necessary to remediate the aforementioned code violations; and (v) the malicious pursuit of two groundless civil actions before the Philadelphia Court of Common Pleas for the purpose of further threatening and intimidating Mr. Tengood, and in order to illegitimately procure a warrant to permit entry into his home to effect Defendant's ulterior intent of stealing additional items of his personal property.

37.     All such conduct was engaged in solely for the monetary and proprietary enrichment of Defendants, under the deceitful guise of legitimate law enforcement efforts and/or the necessary implementation of the City's executive and legislative policy, and served no beneficial public purpose.

### B.  THE MISAPPROPRIATION OF FUNDS SCHEME:

#### The Neighborhood Transformation Initiative and the Federal Funding of CLIP

38.     Former Philadelphia Mayor John F. Street unveiled the Neighborhood Transformation Initiative (hereinafter as "NTI") in April 2001.  The NTI was an aggressive plan to combat blight in distressed Philadelphia neighborhoods through the sale of $250 million in general obligation bonds to finance the acquisition of property, the demolition of derelict

buildings, and the assemblage of large tracts of land for housing redevelopment.  In particular, $20 million was to be allocated for "neighborhood preservation" across the City.

39.    Ultimately Philadelphia City Council voted to authorize the Redevelopment Authority to issue two hundred and ninety five million dollars ($295M) in bonds to finance NTI. Stephen J. McGovern, *Philadelphia's Neighborhood Transformation Initiative: A Case Study of Mayoral Leadership, Bold Planning, and Conflict* (Fannie Mae Found.) 17 Housing Policy Debate 529, at 537 (2006).

40.    The money raised from the bond sale was supplemented by additional federal funds that were used to help sustain NTI over a five-year life span.

41.    Mayor Street also committed to harnessing resources for capital projects to advance the goal of neighborhood transformation, including an ear mark of approximately five hundred million dollars ($500M) in federal and state funds for non-housing projects related to eliminating blight such as "neighborhood beautification."

42.    From this umbrella pool of funds roughly two million dollars ($2M) was used annually to fund CLIP's operations between 2002 and the present. Redevelopment Authority Association of Community Development Corporations, City of Philadelphia: *Vacant Land Management in Philadelphia, The Costs of the Current System and the Benefits of Reform - Final Report* (2010).

*The Illicit Diversion of Federal Funds*

43.    The City, and more specifically Sicinski, Higgins, and Elia, in their capacities as City employees, were direct or indirect recipients of, and were otherwise entrusted with, federal funds that had been allocated as part of the NTI policy agenda.  They systematically diverted these funds away from their intended use of combatting blight in Philadelphia neighborhoods

and instead used these financial resources to further their conspiracy of defrauding Tengood and others for their own personal benefit.

44.     Additionally, the Defendant Inspectors misused physical resources in furtherance of their scheme, including but not limited to, City owned vehicles, tools, and other general inventory, some or, all of which, were purchased with the federal funds described above.

45.     Moreover, these funds and other resources were transferred within and/or in the aggregate had a substantial relationship to interstate commerce.

### C.  THE UNLAWFUL ENTRY AND SEIZURE OF PROPERTY SCHEME:

#### The Corruption of Inspectors Sicinski and Elia

46.     The corruption of Sicinski began in or about February 2004 when he first used his position as a CLIP inspector to gain entry to a private residence and to steal personal property located therein.

47.     On or about February 27, 2004, Mr. Herbert Gold (then 75 years old) of 1313 Unruh Street, Philadelphia, PA reported a theft to the Philadelphia Police Department.  This report indicated that Siciniski had come to Mr. Gold's house and requested access to the back yard to take pictures of the neighbor's house, which was allegedly in violation of the Philadelphia Code.  According to the report, Mr. Gold's briefcase, including $900.00 cash inside, went missing immediately after Sicinski was inside the house. Presentment at 46.

48.     Following an inquiry by detectives and then deputy commissioner of L&I, Robert Solvible, it was determined that Sicinski did in fact have Mr. Gold's briefcase.  Sicinski claimed he had found the briefcase in the trash outside an abandoned building near 1313 Unruh Street -- however, photographs that were taken on the day of the theft do not depict any such trash surrounding the property. *Id.*

49.     Some time after the briefcase theft Sicinski began formulating a plan to expand upon the basic *modus operandi* he established at 1313 Unruh Street.  He set out to recruit other CLIP inspectors and crew members to help him identify and target additional victims throughout the Northeast.  It was Sicinski's intention, through coercion and enticement, to compromise the integrity of Elia, among others, and thereby secure her participation in a more comprehensive scheme involving various illegal activities, including extortion, theft, and the illicit acquisition and sale of firearms, all built upon the Unruh model.

50.     Upon information and belief, Sicinski, Elia, and other CLIP employees thus began developing a profile to serve as the basis for selecting targets of their scheme.  Sicinski and Elia compiled this profile based on their prior work in the field as CLIP inspectors, having become familiar with numerous homes and their residents throughout the Northeast.

51.     Sicinski and Elia (and later Higgins) began devoting additional time and resources (including but not limited to City owned vehicles, cameras, and tools) to travel throughout the Northeast with the specific purpose of conducting supplemental observations of particular properties/residents in order to hone in on ideal targets for the scheme.  These observations were carried out with impunity, under the convenient guise of performing their day-to-day responsibilities as CLIP employees.

52.     Their accumulated experience and observations enabled them to develop an ideal profile for the types of people and properties on which to focus their scheme, namely: (1) elderly and/or disabled persons, preferably living alone; (2) at addresses situated within a roughly sixteen square mile (16 mile$^2$) section of the Northeast bounded by Red Lion Road to the North and Bridge Street to the South, and between Interstate 95 to the East and Algon Avenue to the

West; (3) with an apparent quantity of personal possessions kept in their homes. *See* Map incorporated herein and attached hereto as Exhibit "C".

53.     One additional target was identified at an address outside of the aforementioned geographic area at 2911 Boudinot Street.   The owner of that property, Mr. John Owens, nevertheless fit the target profile in all other respects.

54.     After identifying their targets Sicinski and/or Elia would go the property and conduct a more detailed assessment, relying on undocumented, fabricated or exaggerated code violations to convince the inhabitants to permit them to inspect the perimeter of the property or enter inside the home.   Once inside, Sicinski and/or Elia would go through the property and identify items of value, taking note of their exact location in and around the house.

55.     In instances where they were restricted, for whatever reason, to the outside areas of the property they would survey the inside of the house and its contents through the house's windows.

56.     Sicinski and/or Elia would then communicate the intelligence they gathered to CLIP clean-up crew members who would return (with or without Sicinski and/or Elia) to the property shortly thereafter, to seize the items.   Seizure was effected based on the flawed rationale that removal of the items was necessary to remedy the code violations that Sicinski and or Elia had fabricated in the first place.

57.     The seized items were then divided amongst the conspirators to be sold for cash or kept for personal use.

### *The Targets - Excluding Mr. Tengood & 7219 Saul Street*

58.     Sicinski and Elia initially settled upon at least five properties (excluding Mr. Tengood's residence) to target as part of their scheme to defraud and steal between February

2004 and January 2008: (1) 9021 Convent Avenue, in or about June 2006; (2) 1859 Greymont Street, in or about January 2007; (3) 7200 Marsden Street, in or about January 2007; (4) 1358 Harrison Street, in or about April 2007; and (5) 2911 Boudinot Street, in or about June 2007.

59.     Each of the five targets listed in the preceding paragraph were entered into by Sicinski, Elia, and or other City employees without the home owner's permission or without legal authority . In each case, Sicinski, Elia, and/or other City employees illegally removed large quantities of personal property situated in the homes and converted this property for personal use or exploitation through sale. These stolen items included but were not limited to: guns, cash, electronics, furniture, antiques & familial effects, power tools, and clothing.[1]

60.     From the time of the 2911 Boudinot Street heist in June 2007 until about September 2008, Sicinski and Elia's scheme was temporarily sidelined due to, among other factors, peripheral investigations being carried out by law enforcement officials at both the state and federal level. The investigations were prompted by various crimes, including at least one homicide, that had occurred independent from the CLIP scheme. Ultimately it was determined that at least one of the firearms used in the perpetration of the homicide was in fact one of the guns that had been stolen from the target properties set forth in Paragraph 58 above.

61.     Eventually, however, scrutiny by law enforcement began to subside and Sicinski and Elia again began targeting additional properties to illegally enter into and steal from.

### The Corruption of Higgins and Targeting Mr. Tengood & 7219 Saul Street

62.     On or before September 28, 2008 Sicinski and Elia, having realized they needed additional manpower to continue their scheme, and in the hopes of deflecting any future scrutiny

---

[1]  A Philadelphia Grand Jury later described the scheme accordingly: "[u]nder Sicinski's supervision CLIP teams did not merely clean up yards and exteriors and seal vacant buildings; they performed wholesale clear-outs of houses, in some cases emptying out owner-occupied residences without the owner's consent." Presentment at 7, *In Re County Investigating Grand Jury XXIII*, No. 000901-2008 (Ct. Com. Pl. Phila. County Dec. 15, 2009).

by law enforcement away from themselves, recruited Higgins to assist in the furtherance of the conspiracy.  Higgins agreed to participate.

63.     Towards the latter part of September 2008 Higgins preliminarily identified 7219 Saul Street and Mr. Tengood as an appropriate target for the scheme.  He determined that Mr. Tengood and, at the time, Mr. Tengood's mother Ruth Z. Tengood (who was then still residing at the Saul Street house) fit the requisite profile:  (1) elderly (Mr. Tengood was 59 at the time and his mother was 96); (2) ideally located (7219 Saul Street is located minutes from CLIP headquarters and at the center of the ring of properties that had been targeted previously); and (3) well stocked in terms of the quantity of items in the house.

64.     Higgins was able to determine that Mr. Tengood had a substantial number of items in his home after taking photographs of the inside of the the property through the mail slot of the front door.  In order to take these pictures Higgins approached the front of the house and entered the premises by opening the mail slot and placing a City owned camera and parts of his person inside the structure.   These pictures were taken without Mr. Tengood's consent and without a warrant.

65.     On at least one other occasion Higgins attempted to compile a more detailed inventory of the interior contents of Mr. Tengood's house by breaking into the garage situated at the rear of the property.

66.     Higgins later admitted to taking the photographs and the attempted breaking and entering of Mr. Tengood's garage at an L&I review hearing that took place on or about February 2009.  Mr. Tengood reserves the right here to supplement the allegations in this Complaint by way of attachment of a true and correct copy of the notes of testimony from said hearing, if and when they become available.

67.     Having determined that Mr. Tengood and his home were a prime target, but realizing that the brashness of their earlier exploits was no longer feasible, Sicinski and Elia resolved to establish an increased appearance of legitimacy with respect to their exploit of 7219 Saul Street and Mr. Tengood.

68.     Together with Higgins they began issuing notices of violation to Mr. Tengood for failure to comply with the Philadelphia Property Maintenance Code (hereinafter as, the "Code"), as opposed to simply arriving at the house without warning as had been done with the predecessor targets.  The notices were sent with the specific intent of intimidating Mr. Tengood and coercing him to permit the Defendant Inspectors to enter his house.  It was their further intention to identify and steal Mr. Tengood's property once they had gained access to the house.

69.     On or about September 28, 2008, by way of United States Mail, the City served its first official notice to Mr. Tengood, stating that the conditions of his property where in violation of the Code and that he had ten days to abate the conditions or face the imposition of fines and/or possible imprisonment.  This notice was served at the special insistence of one or all of the Defendant Inspectors.  A true and correct copy of the notice is incorporated herein and attached hereto as Exhibit "D".

70.     The notice cited three specific violations of the Code for the exterior of the house and garage allegedly being overgrown with weeds and plants in excess of ten inches; the rear garage door needing to be replaced or repaired and; the accumulation of  rubbish and/or garbage at the rear of the property.  The notice also cited violations of the Code existing inside the property despite Mr. Tengood's never having granted permission to Defendants to enter his home.

71.     At least three additional notices of violation were then issued to Mr. Tengood by Defendants during the Relevant Times, all of which were based on the same or similar grounds as those set forth in the preceding paragraph, including: (1) notice served on or about August 24, 2009; (2) notice served on or about February 23, 2011; and (3) notice served on or about March 30, 2011.   True and correct copies of said notices are incorporated herein and attached hereto as Exhibits "E," "F," and "G" respectively.

72.     On the contrary, however, throughout the forty four (44) years that Mr. Tengood has lived at 7219 Saul Street there have been no recorded incidents of fire, infestation of rodents or vermin, or the occurrence of major health and safety issues the likes of which Defendant Inspectors claimed were at stake at the property.

73.     Despite the actual, non-offending conditions of Mr. Tengood's property, pursuant to the notices of violations and, according to Defendants, his failure to timely abate such violations, Defendants entered onto/into his property, on at least two occasions, unannounced and without warning and seized a quantity of items kept in the rear yard of the house.

74.     The foregoing scheme, and each act committed in furtherance thereof, constitutes mail fraud and conspiracy to commit mail fraud within the meaning of 18 U.S.C. §1341 and §1349 respectively, in that:

> (a)     Defendants Sicinski, Elia, and Higgins, knowing that the conditions of Mr. Tengood's property were not in violation of the Code, intended to and did, devise, record, issue, manufacture, or otherwise produce artificial or grossly exaggerated accounts of said conditions, in the form of an official City of Philadelphia Notice of Violation; all for the specific purpose,  and with the specific intent, of inducing Mr. Tengood's reliance on the validity

of said notices in order to illegitimately secure his permission for entry into his home, so that Defendants could then steal money or property from him.

(b)     Defendants Sicinski, Elia, and Higgins caused the aforementioned Notices of Violations to be served on Mr. Tengood, by the transport, transmission, and transfer, and attempted transport, transmission, and transfer of each through placement in authorized channels for sending and receiving mail by the United States Postal Service, for the purpose of executing or attempting to execute Defendants' scheme.

75.     The foregoing scheme and each act committed in furtherance thereof constitutes interference with commerce by threats or violence within the meaning of 18 U.S.C. § 1951 and theft by unlawful taking or disposition of property in violation of 18 Pa. C.S. § 3921, respectively, in that:

(a)     Defendants Sicinski, Elia, and Higgins did attempt to commit robbery by conspiring, plotting, or otherwise devising to obtain certain items of Mr. Tengood's personal property, without privilege or legal authority, and with the specific intent to do so,  and by communicating threats of continued and or intensified prosecution against him, by the City of Philadelphia, including fines and possible imprisonment.

(b)     Defendants Sicinski, Elia, and Higgins did commit robbery by facilitating the taking of items of personal property from Mr. Tengood, and with the specific intent to do so, without privilege or legal authority, after CLIP

crew members forcibly entered onto his private property and removed certain of his possessions situated thereon.

(c)     Defendants Sicinski, Elia, and Higgins did commit extortion by attempting to acquire consent from Mr. Tengood to enter his home, in exchange for the Defendants suspending future code enforcement efforts against him, with the ultimate goal of unlawfully taking his personal property once inside, all with the specific intent to do so.

(d)     All such items of property described herein were bought or sold, obtained, or otherwise acquired through the stream and in the ordinary course of commerce existing both within the Commonwealth of Pennsylvania and between it and the several other states of America.

76.     The foregoing scheme and each act committed in furtherance thereof constitutes theft by deception within the meaning of 18 Pa. C.S. § 3922 in that:

(a)     Defendants Sicinski, Elia, and Higgins created the false impression that they possessed the lawful authority to enter into Mr. Tengood's home or onto his property, with the specific intent to create such false impression, in order to then steal his personal property.

77.     The foregoing scheme and each act committed in furtherance thereof constitutes theft by extortion in violation of Pa. C.S. § 3923 in that:

(a)     Defendants Sicinski, Elia, and Higgins acquired Mr. Tengood's personal property or otherwise attempted to withhold his personal property, with the specific intent to do so.

(b)     Defendants Sicinski, Elia, and Higgins did take action by serving additional notices of code violations against Mr. Tengood, in their official capacities, and or promise to withhold from taking additional enforcement action, in their official capacities, in exchange for Mr. Tengood's consent to permit entry to his home so that Defendants could then steal his personal property, all with the specific intent to do so.

### Mr. Tengood is Forced to Move his Mother from the House

78.     At some point during the course of Defendants' initial press to get into 7219 Saul Street, Mr. Tengood was forced to place his mother in an assisted living facility. In addition to being 96 years old at the outset of the scheme, Mrs. Tengood is also a survivor of the Holocaust. She was, therefore, particularly sensitive to the actions taken by Defendants. She became increasingly disturbed and threatened by the continual presence of City officials serving additional notices and bills, and removing items from the exterior of the premises. The stress of the Defendants' on site harassments and intimidation tactics became too much for her to bear. Both her physical and mental health began to deteriorate and it was thus necessary to displace her from her home of nearly 50 years.

79.     Mr. Tengood was extremely distraught and suffered measurable emotional distress over the forced displacement of his mother as the two are very close.

### Mr. Tengood Fights Back

80.     Unlike the previous victims of the conspiracy, Mr. Tengood stood up to the Defendants' affront. He appealed the Code violations to the Board of L&I Review (hereinafter as, the "Board") on or about October 30, 2008 on the grounds that his garage door was not

broken or in need of repair, that the shrubbery around the property was not overgrown and that there was not an accumulation of trash or debris as accused by the City.

81.     At that point Defendants Inspectors' attempt to gain entry to the house had been frustrated, at least temporarily, by Mr. Tengood's resolve.  Angered by his obstinacy but intent on moving forward with the scheme Defendant Inspectors subsequently decided to co-opt the support of the City Solicitor to overcome the obstacle presented by Mr. Tengood's appeal.

### C. THE MALICIOUS PROSECUTION SCHEME:

#### *The Corruption of the City Solicitor*

82.     The City by and through the City Solicitor, at the insistence of and in concert with CLIP and the Defendant Inspectors, initiated its intentional participation in the furtherance of the conspiracy to defraud Mr. Tengood by appearing before the Board at his appeal hearing in February 2009.

#### *The Administrative Review Phase*

83.     At that hearing the City Solicitor willfully supported Defendant Inspectors underlying plan to rob Mr. Tengood by requesting an order to permit L&I and/or CLIP to complete an inspection of both the interior of his home and his garage.  The order was granted by the Board.

84.     Mr. Tengood was subsequently instructed to call Higgins and/or L & I to schedule a time and date for the inspection but he never did.

85.     Thereafter, Higgins, at the insistence of the City Solicitor and with the assistance of Sicinski and Elia, attempted to push forward by taking the initiative and contacting Mr. Tengood on at least one occasion via telephone to schedule and execute the inspection of his

home.  Again Mr. Tengood made himself unavailable and otherwise refused to cooperate still suspicious of the Defendants' motives and the integrity of their presumed authority.

86.     The City Solicitor parried Mr. Tengood's refusal by securing a second review hearing before the Board which took place on or about July 14, 2009, to readdress the issue of entrance into Mr. Tengood's house.  The second hearing was retaliatory tactic to punish Mr. Tengood for his refusal to submit to Defendants' scheme and his persistence with the Appeal. The second hearing also represented an additional display of force by Defendants with the intent to intimidate Mr. Tengood and thwart his resistance.

87.     Undeterred, Mr. Tengood appeared and presented photographs at the second Board hearing that depicted the front and rear of 7219 Saul Street in a well maintained state, with no accumulation of rubbish or overgrowth of plants.  The photos also demonstrated that the garage was not broken and was in working order.

88.     Mr. Tengood also testified before the Board that the garage door as depicted in the photographs he presented was in the same unadulterated condition that it had always been in.

89.     Additionally, he reiterated the fact that he had not given consent for CLIP and the City to search his property, that probable cause was lacking to justify any such inspection, and that the City's actions were an unlawful intrusion into his privacy.  A true and correct copy of the Notes of Testimony from the hearing are incorporated herein and attached hereto as  Exhibit "H".

90.      Defendants, on the other hand, presented no documentary evidence of the alleged violations existing inside the house referred to in the September 28, 2008 notice.  They did, however, present the pictures of the inside of Mr. Tengood's garage that Higgins had illegally procured when he broke in to the structure.  According to Mr. Tengood the only way that Higgins

could have taken pictures of the interior of the garage is if he opened the garage door and/or made his way inside the structure because the garage was always kept closed. *Id.* at 12.

91.     On or about this time, the City Solicitor also expressed her view that Mr. Tengood is an obsessive compulsive "hoarder,"  and was therefore amassing unhealthy/unsafe quantities of personal property within the house.[2]  According to the City Solicitor this alleged quantity of personal property sufficed as probable cause for the City to enter Mr. Tengood's house and make an inspection of the premises.  However, no medical or other expert diagnoses, testimony, or evidence of any kind was presented by Defendants, at any point throughout the entirety of the litigation, to support their proposition that Mr. Tengood was an obsessive compulsive "hoarder."

92.     Notwithstanding the City's apparent lack of evidence, and dismissive of Mr. Tengood's privacy concerns, the Board affirmed Defendants' contention that Code violations existed at the subject premises and voted in support of the grant of a court order to inspect the interior of the house and the garage.

### *The Civil Litigation Phase*

93.     On or about August 2, 2009, under the advice of counsel, Mr. Tengood filed an appeal of the Board's decision in the Philadelphia Court of Common Pleas.  His appeal argued that the City's insistence in gaining entry to his home violated his Constitutional right of privacy and was inconsistent with the letter and spirit of the 4th Amendment.  A true and correct copy of

---

[2] "The essential features of Obsessive Compulsive Disorder are recurrent obsession or compulsions that are sever enough to be time consuming (i.e. they take more than 1 hour a day) or cause marked distress or significant impairment...[b]y definition, adults with Obsessive-Compulsive Disorder have at some point recognized that the obsessions or compulsions are excessive or unreasonable... [h]owever...there is a broad range of insight into the reasonableness of the obsessions or compulsions.  Some individuals are uncertain about the reasonableness of their obsessions or compulsions, and any given individual's insight may vary across times and situations... [a]t those times when the individual recognizes that the obsessions and compulsions are unreasonable, he or she may desire or attempt to resist them.  When attempting to resist a compulsion, the individual may have a sense of mounting anxiety or tension that is often relieved by yielding to the compulsions, the individual may give in to them, no longer experience a desire to resist them, and may incorporate the compulsion into his or her daily routines." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, *Text Revision* (4th ed. 2000). *See also*, Diagnostic Criteria for Obsessive Compulsive Disorder and Proposed Amendments to be included in DSM-V, incorporated herewith and attached hereto as Appendix I.

Docket No. 090800718 from *Tengood v. Board of License & Inspection Review*, No. 090800718 (Ct. Com. Pl. Phila. County Jan. 4, 2010), is incorporated herein and attached hereto as Exhibit "I".

94.    The appeal also challenged the factual sufficiency and legal integrity of the City's evidence regarding the existence of Code violations inside his home and the extent to which the Board's decision and the Defendants' dogged pursuit of a "lawful" means of entering his home were in retaliation to Mr. Tengood's committed refusal to submit to Defendants' scheme.

95.    At the same time Mr. Tengood's appeal was pending, on or about September 2, 2009, the City filed a parallel suit in the Court of Common Pleas, at the behest of the City Solicitor. A true and correct copy of Docket No. 090804079 from *Philadelphia v. Tengood et al.*, No. 090804079 (Ct. Com. Pl. Phila. County Sept. 2, 2009), is incorporated herein and attached hereto as Exhibit "J".

96.    The City's Complaint sought equitable relief, including, among other things, a permanent injunction requiring Mr. Tengood to "take whatever action necessary to correct all violations of the Philadelphia Code at 7219 Saul Street...and if necessary vacate the premises." The City Complaint also sought to have the subject premises inspected by L&I both inside and out and threatened Mr. Tengood with being forcibly removed from his house and/or the imposition of fines of $300.00/day during any period of his continued non-compliance.

97.    After the filing of several pleadings by all parties and following oral argument Judge Peter F. Rogers entered an order requiring Mr. Tengood to submit to a full and complete inspection of the interior of his home by L&I, scheduled to take place on February 23, 2009 at 10AM.

98.     The order stated that "[Mr. Tengood] or otherwise responsible parties of the subject premises shall permit and provide access to the Department...if [Mr. Tengood] or anyone acting on [his] behalf, impede or refuse entry, *the Department, with the assistance of the Sheriff's Office of Philadelphia County, and if asked, the Philadelphia Police Department shall use whatever reasonable force is necessary to gain entry into said premises for the purpose of conducting an inspection*." (emphasis added).   A true and correct copy of the Order is incorporated herein and attached hereto as Exhibit "K".

99.     Judge Rogers' order was entered despite the fact that Mr. Tengood had two sets of preliminary objections pending before the court, challenging the validity of the City's Complaint, on which no rulings had been issued.

100.    Judge Rogers was removed from the case following the November 20th ruling for reasons as yet known;  nor is it known whether Judge Rogers was complicit in the Defendant's scheme.

101.    Regardless of the issue of Judge Rogers' complicity, his order at last provided Defendants with a purportedly "lawful" means of entering 7219 Saul Street in order to carryout the objects of their conspiracy.

### *Defendants' Scheme is Discovered and Finally Unravels*

102.    Approximately one month following Judge Rogers' order in *City of Philadelphia v. Tengood et al.*, on or about December 19, 2009, a Grand Jury empaneled before the Philadelphia Court of Common Pleas, made a formal presentment to the Honorable Renee Cardwell Huges, following its investigation of illegal firearms and the activities of gun traffickers operating in the City of Philadelphia.

103.     The Grand Jury concluded that probable cause existed to believe that members of CLIP had engaged in a criminal conspiracy to steal firearms, ammunition, money, jewelry, furniture, tools, clothing, and other items from the homes that it was supposed to be remedying of code violations.

104.     The Presentment detailed findings of egregious abuses of authority by the City and CLIP and recommended that nine CLIP employees, including Siciniski, be charged with multiple felonies including perjury and corrupt organization under 18 Pa. C.S. § 911 *et. seq.*

105.     Sincinski and the other indictees ultimately plead guilty to all charges on or about September 2011.

106.     The Grand Jury also noted a complete lack of executive oversight of CLIP and specifically identified Deputy Managing Director Thomas Conway as having utterly failed to execute his managerial responsibilities.

### *The Remaining Conspirators Scramble to Cover-Up their Involvement*

107.     Realizing the danger they faced following the indictment of Sicinski, the City Solicitor, Higgins, and Elia immediately set to covering up their participation in the scheme to foreclose the possibility of their own criminal prosecutions being sought by the Philadelphia District Attorney.

108.     To begin with, Higgins and Elia did not follow through with the inspection of 7219 Saul Street as originally planned.  Meanwhile, the City Solicitor arranged for a continuance of the hearing that was stipulated in Judge Rogers' November 20th order for the purpose of assessing the outcome of the inspection.

109.     The post-inspection hearing was thus continued until January 20, 2010.

110.    At the January 20th hearing the City Solicitor abandoned her earlier position that the City had an unequivocal right, under the circumstances, to enter Mr. Tengood's residence based on his alleged hoarding problem and the non-compliant exterior conditions of his property. In particular, she stated "that the issue of probable cause for conducting the inspection may now not be in the City's favor[.]"  A true and correct copy of the Notes of Testimony from the January 20, 2011 hearing are incorporated herein and attached hereto as Exhibit "L"

111.    The court subsequently tempered Judge Rogers' initial inspection order, revising it to only permit an inspection of the exterior of 7219 Saul Street.  The results of the exterior inspection would then be relied upon to determine whether probable cause existed to warrant an inspection of the interior of the property.

### The City's Equity Suit is Disposed

112.    Whether or not the City ever conducted the limited exterior inspection remains unclear.  The equity hearing that followed the proposed date of the exterior inspection was nevertheless disposed of in Mr. Tengood's favor on February 9, 2010; the truth having surfaced, that probable cause did not exist sufficient to lawfully permit the City to enter Mr. Tengood's home.  The court's previous inspection order was subsequently revised and the decision taken thereon was vacated.  A true and correct copy of the final order is incorporated herein and attached hereto as Exhibit "M".

113.    A final disposition of the case in Mr. Tengood's was then ordered on March 22, 2010.

### Mr. Tengood's L&I Appeal is Affirmed

114.    Similarly, Mr. Tengood's appeal of the original September 28, 2008 violation issued by Defendant Inspectors was decided in his favor.  Judge Idee Fox ordered the appeal

withdrawn and settled on or about March 12, 2010.  The alleged Code violations were quashed and the remediation fees assessed against Mr. Tengood by the City were expunged.  A true and correct copy of the final order is incorporated herein and attached hereto as Exhibit "N".

### D.  DAMAGES AND THE AFTERMATH OF THE SCHEME:

115.   By the time Mr. Tengood's cases were decided in his favor he had spent nearly two years battling the City in court, and had paid upwards of $25,000 in legal fees and expenses in presenting his defense(s).

116.   Mr. Tengood also suffered (and continues to suffer) psychological trauma from Defendants' aggressive and illegitmate campaign, both in and out of court, to enter into his home and/or take his possessions.  As mentioned above, his emotional distress was exacerbated by the mental and physical toll the ordeal had exacted on his mother.  He sought out and received counseling at his own expense to help alleviate this trauma at a local psychotherapy practice - Counseling & Therapy Associates.

117.   Notwithstanding Mr. Tengood's hard fought victories in Court and the CLIP conspiracy having apparently been foiled by the District Attorney's diligence, the program remains a part of the City's municipal services core.

118.   Managerial oversight of CLIP remains deficient as does the implementation of the program's authorized policies and procedures.  There are no clear standards for the determination of circumstances which do in fact justify CLIP intervention, record keeping and reporting of supposed violations is disorganized and incomplete, and CLIP inspectors continue to abuse or inappropriately exercise the limited regulatory capacity with which they are vested.

119.     As recent as March 30, 2011 Mr. Tengood received a notice of violation via USPS from CLIP officials.  *See* Exhibit "G".  Then, on June 13, 2011, a CLIP clean up crew again entered into Mr. Tengood's back yard, unannounced and without a warrant, and removed a quantity of items situated therein.  These items included materials which Mr. Tengood had set aside for recycling, at least one article of clothing, and several boxes of non-perishable food items that were sealed in factory packaging and only temporarily left in the driveway while Mr. Tengood moved the items from his car into his house.

120.     Mr. Tengood received a subsequent bill from the City for $123.82 for clean-up and removal of the aforementioned items.  A true and correct copy of the bill is incorporated herein and attached hereto as "Exhibit O".

121.     The foregoing scheme, and each act committed in furtherance thereof, constitutes a retaliation against a witness or victim for attendance at an official proceeding by damaging that person's tangible property, within the meaning of 18 U.S.C. § 1513(b), in that:

     (a)    Defendants responded to Mr. Tengood's various appearances before administrative review boards and the Philadelphia Court of Common Pleas, in opposition to the forcible entry of his home, and the unlawful taking of his property, by serving additional notices of violations, with the specific intent of doing so.

     (b)    Defendants responded to Mr. Tengood's various appearances before administrative review boards and the Philadelphia Court of Common Pleas, in opposition to the forcible entry of his home, and the unlawful taking of his property by persisting with meritless prosecutions of fabricated code violations against him, with the specific intent of doing so.

# III. CLAIMS FOR RELIEF

A.  COUNT ONE - VIOLATION OF 18 U.S.C. § 1962(b):

(DEFENDANTS CITY AND ALL OTHERS IN THEIR OFFICIAL CAPACITIES)

122.    Mr. Tengood realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

123.    At all Relevant Times the City was an individual and/or person acting through its officials and agents, including but not limited to, Defendants Conway, Sicinski, Elia, Higgins, the City Solicitor, and other wrong doers.

124.    At all Relevant Times, the City, CLIP, Conway, Sicinski, Elia, Higgins, the City Solicitor, and other wrongdoers were an enterprise as defined in 18 U.S.C. §1961 and were engaged in and their activities affected interstate commerce.  Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

125.    Specifically, Defendants participated in the conduct of the affairs of the CLIP scheme (the "Enterprise"), through a pattern of racketeering activities, having committed two or more racketeering acts -- which constitute violations of, to wit: 18 U.S.C. § 1341 (the federal mail fraud statute); 18 U.S.C. § 1951 (the federal obstruction, by extortion, of goods moving in commerce statute); 18 U.S.C. § 1513 (the federal retaliation against a witness or victim for attendance at an official proceeding statute); 18 Pa. C.S. § 3921 (Pennsylvania's theft by unlawful taking or disposition of property statute); 18 Pa. C.S. § 3922 (Pennsylvania's theft by deception statute); and 18 Pa. C.S. § 3923 (Pennsylvania's theft by extortion statute) -- on behalf of the conspiracy.

126.     Conway, Sicinski, Elia, Higgins, and the City Solicitor's violation of §1962(b) was related to, and enabled by their employment with the City; was committed in furtherance of the business and official policy of the City; and was authorized and acquiesced in by the City. The City subsequently acquired and maintained and interest in the Enterprise as a result of Conway, Sicinski, Elia, Higgins, and the City Solicitor's violation of §1962(b) . The City is thus liable as a principle for violating § 1962(b), based on the aggregate intent and actions taken by Sicinski, Elia, and Higgins, and more particularly based on the intent manifested and actions taken by its executive level employees, namely Conway and the City Solicitor, responsible for its control and direction.   What is more, the individual Defendants represented themselves as contributing to the implementation of official City policy, enacted by City Council and effected by the Mayor, as part of the Neighborhood Transformation Initiative.

127.     Mr. Tengood has been injured in his person, business, and or property, to an extent and in an amount to be proven at trial, as a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(b).

128.     As a direct and proximate result of the acts of Defendants, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally, against Defendants City and Conway, Sicinski, Elia, Higgins, and the City Solicitor, in their official capacities pursuant to 18 U.S.C. § 1964 for treble damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

**B.  COUNT TWO - VIOLATION OF 18 U.S.C. § 1962(d):**

**(DEFENDANTS CITY AND ALL OTHERS IN THEIR OFFICIAL CAPACITIES)**

129.    Mr. Tengood realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

130.    During the Relevant Times the City was an individual and/or person acting through its officials, employees and agents, including but not limited to, Defendants Conway, Sicinski, Elia, Higgins, the City Solicitor, and other wrong doers.

131.    At all Relevant Times, the City, CLIP, and Conway, Sicinski, Elia, Higgins, the City Solicitor, and other wrongdoers were an enterprise as defined in 18 U.S.C. §1961 and were engaged in, and their activities affected, interstate commerce.  Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

132.    Defendants City, Conway, Sicinski, Elia, Higgins, the City Solicitor and other wrongdoers conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d).

133.    Specifically, Defendants conspired, confederated, and agreed with each other to conduct and participate in the conduct of the affairs of the CLIP scheme (the "Enterprise"), through a pattern of racketeering activities, and they agreed that two or more racketeering acts -- which constitute violations of, to wit: 18 U.S.C. § 1341 (the federal mail fraud statute); 18 U.S.C. § 1951 (the federal obstruction, by extortion, of goods moving in commerce statute); 18 U.S.C. § 1513 (the federal retaliation against a witness or victim for attendance at an official proceeding statute); 18 Pa. C.S. § 3921 (Pennsylvania's theft by unlawful taking or disposition of property statute); 18 Pa. C.S. § 3922 (Pennsylvania's theft by deception statute); and 18 Pa. C.S.

§ 3923 (Pennsylvania's theft by extortion statute) -- would be committed on behalf of the conspiracy.

134.    Conway, Sicinski, Elia, Higgins, and the City Solicitor's violation of §1962(d) was related to, and enabled by their employment with the City; was committed in furtherance of the business of the City; and was authorized and acquiesced in by the City.   The City subsequently acquired and maintained an interest in the Enterprise as a result of Conway, Sicinski, Elia, Higgins, and the City Solicitor's violation of §1962(d) .  The City is thus liable as a principle for violating § 1962(d), based on the aggregate [specific] intent and actions taken by Sicinski, Elia, and Higgins, and more particularly based on the [specific] intent manifested and actions taken by its executive level employees, namely Conway and the City Solicitor, responsible for its control and direction.  What is more, the individual Defendants represented themselves as contributing to the implementation of official City policy, enacted by City Council and effected by the Mayor, as part of the Neighborhood Transformation Initiative.

135.    Mr. Tengood has been injured in his person, business, and or property, to an extent and in an amount to be proven at trial, as a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(d).

136.    As a direct and proximate result of the acts of Defendants, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

**WHEREFORE**, Plaintiff Stephen P. Tengood respectfully prays for judgment, jointly and severally, against Defendants City and Conway, Sicinski, Elia, Higgins, and the City Solicitor, in their official capacities, pursuant to 18 U.S.C. § 1964, for treble damages, interest,

attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

## C. COUNT THREE - VIOLATION OF 18 U.S.C. § 1962(c):

### (DEFENDANTS SICINSKI, ELIA, HIGGINS & THE CITY SOLICITOR IN THEIR INDIVIDUAL CAPACITIES)

137.    Mr. Tengood realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

138.    During all Relevant Times, CLIP, together with the individual Defendants Sicinski, Elia, Higgins, and the City Solicitor were an enterprise as defined in 18 U.S.C. §1961 and were engaged in and their activities affected interstate commerce.  Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

139.    Specifically, Sicinski, Elia, Higgins, and the City Solicitor participated in the conduct of the affairs of the CLIP scheme (the "Enterprise"), through a pattern of racketeering activities, having committed two or more racketeering acts which constitute violations of, to wit: 18 U.S.C. § 1341 (the federal mail fraud statute)18 U.S.C. § 1951 (the federal obstruction, by extortion, of goods moving in commerce statute); 18 U.S.C. § 1513 (the federal retaliation against a witness or victim for attendance at an official proceeding statute); 18 Pa. C.S. § 3921 (Pennsylvania's theft by unlawful taking or disposition of property statute); 18 Pa. C.S. § 3922 (Pennsylvania's theft by deception statute); and 18 Pa. C.S. § 3923 (Pennsylvania's theft by extortion statute) -- on behalf of the conspiracy.

140.    The scheme to defraud Mr. Tengood evolved over time as a pattern of racketeering activities through the issuance of several fraudulent code violations by CLIP

inspectors, multiple bills for clean-up services, and at least two instances of the City's unlawfully entering onto his private property and seizing his personal possessions.

141.    The pattern of racketeering acts was further supplemented by the malicious pursuit of two civil suits against Mr. Tengood, by the City Solicitor, each of which was focused on threatening and intimidating him in order to get inside his house so that the Defendant inspectors could steal additional items of his personal property. In each instance, however, the prosecutions were found to be without factual and/or legal merit and were dismissed in Mr. Tengood's favor.

142.    What is more, the acts directed against Mr. Tengood occurred in addition to those acts perpetrated by Defendant Inspectors against the other victims of the CLIP scheme, more particularly described in Paragraphs 58 through 61 above.

143.    The actions of Defendant Inspectors and the City Solicitor were wanton, malicious, and oppressive, thus entitling Mr. Tengood to an award of punitive damages.

144.    Mr. Tengood has been injured in his person, business, and property, to an extent and in an amount to be proven at trial, as a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(c).

145.    As a direct and proximate result of the acts of Defendants, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

        **WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Sicinski, Elia, Higgins, and the City Solicitor, in their individual capacities, pursuant to 18 U.S.C. § 1964 for treble damages, punitive damages,

interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

## D. COUNT FOUR - VIOLATION OF 18 U.S.C. § 1962(d):

### (DEFENDANTS SICINSKI, ELIA, HIGGINS & THE CITY SOLICITOR IN THEIR INDIVIDUAL CAPACITIES)

146.    Mr. Tengood realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

147.    During all Relevant Times, CLIP, together with the individual Defendants Sicinski, Elia, Higgins, and the City Solicitor were an enterprise as defined in 18 U.S.C. §1961 and were engaged in and their activities affected interstate commerce.  Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

148.    These individual Defendants conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

149.    Specifically Defendants Siciniski, Elia, Higgins, and the City Solicitor conspired, confederated, and agreed with each other to conduct and participate in the conduct of the affairs of the CLIP scheme (the "Enterprise"), through a pattern of racketeering activities, and they agreed that two or more racketeering acts -- which constitute violations of, to wit: 18 U.S.C. § 1341 (the federal mail fraud statute); 18 U.S.C. § 1951 (the federal obstruction, by extortion, of goods moving in commerce statute); 18 U.S.C. § 1513 (the federal retaliation against a witness or victim for attendance at an official proceeding statute); 18 Pa. C.S. § 3921 (Pennsylvania's theft by unlawful taking or disposition of property statute); 18 Pa. C.S. § 3922 (Pennsylvania's theft by deception statute); and 18 Pa. C.S. § 3923 (Pennsylvania's theft by extortion statute) -- would be committed on behalf of the conspiracy.

150.    The actions of Defendant Inspectors and the City Solicitor were wanton, malicious, and oppressive, thus entitling Mr. Tengood to an award of punitive damages.

151.    Mr. Tengood has been injured in his person, business, and property, to an extent and in an amount to be proven at trial, as a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(d).

152.    As a direct and proximate result of the acts of Defendants Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

WHEREFORE, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Sicinski, Elia, Higgins, and the City Solicitor in their individual capacities pursuant to § 1964 for treble damages, punitive damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

E.  COUNT FIVE - VIOLATION OF THE CIVIL RIGHTS ACT §1983:

(DEFENDANTS CITY AND CONWAY, SICINSKI, ELIA & HIGGINS
IN THEIR OFFICIAL CAPACITIES)

153.    Mr. Tengood realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

154.    During the Relevant Times the City was an individual and/or person acting through its officials, employees and agents, including but not limited to, Defendants Conway, Sicinski, Elia, Higgins, and other wrong doers.

155.    During the Relevant Times the City and Defendants Conway, Sicinski, Elia, and Higgins were responsible for the appropriate care, custody, and or control of Mr. Tengood's personal property.

156.    During the Relevant Times the City and Defendants Conway, Sicinski, Elia, and Higgins were responsible for the appropriate use and implementation of City vehicles in connection with the care, custody, and or control of Mr. Tengood's personal property.

157.    The City Council of Philadelphia is vested by state law, including but not limited to the Philadelphia Home Rule Charter, with the authority to make policy for the City regarding the regulation and enforcement of, among others, the Philadelphia Property Maintenance Code. Moreover, Council and the Mayor are vested with authority to delegate regulation and enforcement of the Code to various City departments and executive agencies as appropriate, including but not limited to, the Managing Directors Office, the Department of Licenses & Inspections, and the Department of Streets.

158.    As such, during the Relevant Times, Defendants Conway, Sicinski, Elia, and Higgins acted under the direction and control of the City and under color of the laws, statues, ordinances, regulations, policies, customs, and usages of the Commonwealth of Pennsylvania, and the City of Philadelphia, as enacted by Council, including but not limited to, the Department of Licenses & Inspection's "Personal Property, Salvage Items, and Equipment Policy" and the Neighborhood Transformation Initiative.

159.    Acting under color of law and pursuant to official policy, practice or custom, Defendant Conway and the City intentionally, knowingly, recklessly, or negligently failed to instruct supervise, control and discipline, on a continuing basis, Defendants Sicinski, Elia, and Higgins in their duties to refrain from unlawfully entering upon the private property of Mr.

Tengood, conducting unlawful searches of the premises, and unlawfully seizing personal property situated thereon.

160.    Acting under color of law and pursuant to official policy, practice or custom, Defendant Sicinski and the City intentionally, knowingly, recklessly, or negligently failed to instruct supervise, control and discipline, on a continuing basis, Defendants Elia and Higgins in their duties to refrain from unlawfully entering upon the private property of Mr. Tengood, conducting unlawful searches of the premises, and unlawfully seizing personal property situated thereon.

161.    Defendants Conway and Sicinski and the City had knowledge, or, had they diligently exercised their duties to instruct, supervise, control, and discipline Defendants Elia and Higgins on a continuing basis, should have had knowledge that the alleged wrongs were about to be committed.

162.    Defendants Conway and Sicinski and the City had power to prevent or aid in preventing the commission of the aforementioned wrongs, could have done so by reasonable diligence, and intentionally, knowingly, recklessly, or negligently failed or refused to do so.

163.    Defendants Conway and Sicinski and the City therefore, directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, negligent or wanton conduct of Defendants Elia and Higgins.

164.    Defendant Conway and the City also therefore, directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, negligent or wanton conduct of Defendants Sicinski, Elia, and Higgins.

165.    As a direct and proximate result of Defendants Conway, Sicinski, Elia, Higgins and the City's acts, Mr. Tengood was deprived of his right to be free from unlawful searches and

seizures in violation of the Fourth and Fourteenth Amendments to the United States Constitution and protected by 42 U.S.C. § 1983.

166.    Mr. Tengood has been injured in his person, business, and property, to an extent and in an amount to be proven at trial, as a direct and proximate result of the foregoing violations of the Constitution and 42 U.S.C. § 1983.

167.    As a direct and proximate result of the acts of Defendants Conway, Sicinski, Elia, Higgins and the City Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Conway, Sicinski, Elia, Higgins, and the City for compensatory damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

### F.   COUNT SIX - VIOLATION OF THE CIVIL RIGHTS ACT § 1983:

#### (DEFENDANTS CITY AND THE CITY SOLICITOR IN HER OFFICIAL CAPACITY )

168.    Mr. Tengood realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

169.    During the Relevant Times the City was an individual and or person acting through its officials, employees and agents, including but not limited to, Defendant City Solicitor.

170.    The City Council of Philadelphia is vested by state law, including but not limited to the Philadelphia Home Rule Charter, with the authority to make policy for the City regarding the regulation and enforcement of, among others, the Philadelphia Property Maintenance Code. Moreover, Council and the Mayor are vested with authority to delegate regulation and

enforcement of the Code to various City departments and executive agencies as appropriate, including but not limited to the City Solicitors' Office.

171.    As such, during the Relevant Times, Defendant City Solicitor acted under the direction and control of the City and under color of the laws, statues, ordinances, regulations, policies, customs, and usages of the Commonwealth of Pennsylvania, and the City of Philadelphia, as enacted by Council, in prosecuting two civil suits against Mr. Tengood for meritless violations of the Code and for the procurement of a search warrant without probable cause and or in bad faith.

172.    Acting under color of law and pursuant to official policy, practice or custom, the City Solicitors' Office and the City intentionally, knowingly, recklessly, or negligently failed to instruct supervise, control and discipline, on a continuing basis, Defendant City Solicitor in her duties to refrain from pursuing unfounded civil prosecutions and for advocating for a court ordered search of Mr. Tengood's home without probable cause and or in bad faith.

173.    The City Solicitors' Office and the City had knowledge, or, had they diligently exercised their duties to instruct, supervise, control, and discipline Defendant City Solicitor on a continuing basis, should have had knowledge that the wrongs that were done, as alleged throughout this Complaint, were about to be committed.

174.    The City Solicitors' Office and the City, directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, wanton, or negligent conduct of Defendant City Solicitor.

175.    As a result of the City's acts as alleged in Paragraphs 82 through 101 above, Mr. Tengood was deprived of his right to be free from unlawful searches and seizures in violation of

the Fourth and Fourteenth Amendments to the United States Constitution and protected by 42 U.S.C. § 1983.

176.    As a direct and proximate result of the acts of Defendant City Solicitor and the City, and the deprivation of rights caused therefrom, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the loss of personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Conway, Sicinski, Elia, Higgins, and the City for compensatory damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

### G.  UNDERLINE Count Seven - Violation of the Civil Rights Act § 1983:

### (Defendants Conway, Sicinski, Elia, Higgins, & the City Solicitor in their Individual Capacities)

177.    Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph as if fully set forth herein.

178.    Defendants Conway, Sicinski, Elia, Higgins, and the City Solicitors' conduct was undertaken individually or in concert with one another during the Relevant Times.

179.    Defendants Sicinski, Higgins, Elia and the City Solicitor used their status as employees of the City, and by representing themselves as acting under color of law, to issue and enforce fraudulent or otherwise unjustified violations of Philadelphia's Property Maintenance Code as part of their scheme to defraud Mr. Tengood.  These violations were served together with unjustified bills for municipal services deemed necessary to remedy the violations. Pursuant to the presumed legal authority stemming from these violations Sicinski, Elia, and

Higgins attempted to and did enter onto Mr. Tengood's property, and into his house, in addition to seizing or facilitating the seizure of his personal property situated thereon.

180.    The ultimate purpose of these actions was to further intimidate Mr. Tengood in order to gain entry to his home in order to extort money and additional items of personal property from him, in the same manner as the other six homes targeted before his, as more particularly described in Paragraphs 58 through 61 above.

181.    Likewise, Defendant City Solicitor pursued two meritless civil prosecutions, advocating in each case for court ordered search warrants, without probable cause and or in bad faith. It was the City Solicitor's intention to procure Defendant Inspectors with a seemingly lawful means of entry into  Mr. Tengood's home, in order to execute the scheme set forth above.

182.    Defendant Conway acquiesced in the conduct undertaken by the other individual Defendants by intentionally, willfully, recklessly, knowingly, or negligently failing to discover, discipline or otherwise prohibit such conduct.

183.    What is more, the Defendants' actions were wanton, malicious, and oppressive, thus entitling Mr. Tengood to an award of punitive damages.

184.    As a result of Defendants' actions, Mr. Tengood was deprived of his right to be free from unlawful searches and seizures in violation of the Fourth and Fourteenth Amendments to the United States Constitution and protected by 42 U.S.C. § 1983.

185.    As a direct and proximate result of the Defendants' acts, and the deprivation of rights caused therefrom, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the loss of personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Conway, Sicinski, Elia, Higgins, and the City Solicitor

for compensatory damages, punitive damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

**H. COUNT EIGHT - IN THE ALTERNATIVE, VIOLATION OF THE AMERICANS WITH DISABILITY ACT § 12132:**

**(DEFENDANTS CITY AND THE CITY SOLICITOR IN HER OFFICIAL CAPACITY)**

186.    Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph as if fully set forth herein.

187.    CLIP was conceived of and ratified by City Council and ultimately facilitated with the use of Federal funds that were allocated to the program as part of the Neighborhood Transformation Initiative.

188.    During the Relevant Times, CLIP was/is a "program or activity" as defined in 42 U.S.C. § 2000d-4a.

189.    CLIP was implemented and enforced by the City's agents, employees, contractors, and others, including but not limited to, the City Solicitor during the Relevant Times.

190.    CLIP was/is intended to positively benefit the health and general welfare of Philadelphia residents, including but not limited to, Mr. Tengood.

191.    The City Solicitor expressed and or manifested a belief, either explicitly or implicitly, that Mr. Tengood was a qualified individual with a disability as defined in 42 U.S.C. § 12131(2) - as one who suffers from obsessive compulsive disorder (hoarding type) - during the Relevant Times. *See also* Appendix I.

192.    The City Solicitor expressed and/or manifested a belief, either explicitly or implicitly, that the fact of Mr. Tengood's disability gave the City the unilateral right to take his

personal property and force entry into his home without regard for his disability or his legal rights.

193.    In the alternative therefore, during the Relevant Times, Defendant City Solicitor, acting under color of law and pursuant to official policy, practice or custom, intentionally, knowingly, recklessly, maliciously, or negligently discriminated against Mr. Tengood in her administration of CLIP, by specifically targeting him for aggressive enforcement of the Code in violation of 42 U.S.C. § 12132.

194.    The violation of § 12132 was related to and committed within the course of the City Solicitor's employment with the City; was committed in furtherance of the business of the City; and was authorized and acquiesced in by the City.  In addition, the City was the intended beneficiary of the City Solicitor's violative conduct in the form of ill gotten penalties and fees from Mr. Tengood.   Thus, the City is liable for violating § 12132 under the doctrine of *respondeat superior*.

195.    The City Solicitor's violation of § 12132 was related to and committed within the course of her status as an agent of the City; was committed in furtherance of the business of the City and official government policy; and was authorized and acquiesced in by the City.  In addition, the City was the intended beneficiary of the City Solicitor's violative conduct in the form of ill gotten penalties and fees from Mr. Tengood.  Thus, in the alternative, the City is liable for the violation as the principle party based on the conduct of the City Solicitor, its agent.

196.    Mr. Tengood has been injured in his person, business, and property, to an extent and in an amount to be proven at trial, as a direct and proximate result of the foregoing violation of 42 U.S.C. § 12132.

197.    As a direct and proximate result of the acts of Defendants City and the City Solicitor, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants City and the City Solicitor for compensatory damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

### I.   COUNT NINE - NEGLIGENCE:

### (ALL DEFENDANTS)

198.    Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

199.    Defendants owed Mr. Tengood a duty of care with respect to the execution of their employment and/or agency with the City.

200.    This duty includes, but is not limited to, express provisions of the Philadelphia Home Rule Charter, binding upon all Defendants named herein.

201.    Defendants did breach their duty of care, owed to Mr. Tengood, as more particularly described by the allegations set forth above.

202.    Mr. Tengood has been injured in his person, business, and property, to an extent and in an amount to be proven at trial, as a direct and proximate result of Defendants' Negligence.

203.    As a direct and proximate result of the negligent acts of Defendants, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the permanent loss of valuable personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants for compensatory damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

### J.  COUNT TEN - MALICIOUS PROSECUTION:

#### (DEFENDANTS CONWAY, SICINSKI, ELIA, HIGGINS, AND THE CITY SOLICITOR IN THEIR INDIVIDUAL CAPACITIES)

204.   Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

205.   Defendants Conway, Sicinski, Elia, Higgins, and the City Solicitors' conduct was undertaken individually or in concert with one another during the Relevant Times.

206.   Defendants Sicinski, Higgins, Elia and the City Solicitor participated in the issuance and enforcement of fraudulent or otherwise unjustified violations of Philadelphia's Property Maintenance Code as part of their scheme to defraud Mr. Tengood.

207.   The ultimate purpose of these actions was to further intimidate Mr. Tengood in order to gain entry to his home in order to extort money and additional items of personal property from him.

208.   In particular, Defendant City Solicitor pursued two meritless civil prosecutions, advocating in each case for court ordered search warrants, without probable cause and/or in bad faith. It was the City Solicitor's intention to procure Defendant Inspectors with a seemingly lawful means of entry into  Mr. Tengood's home, in order to execute the scheme set forth above.

209.   Defendant Conway acquiesced in the conduct undertaken by Sicinski, Elia, Higgins, and the City Solicitor intentionally, willfully, recklessly, knowingly, or negligently failing to discover, discipline or otherwise prohibit such conduct.

210.    What is more, these Defendants' actions were wanton, malicious, and oppressive, thus entitling Mr. Tengood to an award of punitive damages.

211.    As a result of the Defendants' conduct Mr. Tengood was the victim of malicious prosecution in violation of 42 Pa. C.S. § 8351 *et seq*. (the Dragonnetti Act).

212.    As a direct and proximate result of the Defendants' actions and the malicious prosecution caused therefrom, Mr. Tengood suffered lost time and earnings, severe mental and emotional anguish, and the loss of personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Conway, Sicinski, Elia, Higgins, and the City Solicitor for compensatory damages, punitive damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

## K.  COUNT ELEVEN - CONVERSION:

### (DEFENDANTS SICINSKI, ELIA, AND HIGGINS IN THEIR INDIVIDUAL CAPACITIES)

213.    Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph as if fully set forth herein.

214.    Defendants Sicinski, Elia, and Higgins'conduct was undertaken individually or in concert with one another during the Relevant Times.

215.    Whereas, Defendants Sicinski, Elia, and Higgins attempted to and did enter onto Mr. Tengood's property, and into his house, and seized items of his personal property situated thereon, without his consent and without legal justification, deprived or otherwise interfered with Mr. Tengood's right to property and/or the use or possession of his chattels.

216.    Defendants' actions were wanton, malicious, and oppressive, thus entitling Mr. Tengood to an award of punitive damages.

217.    As a direct and proximate result of Sicinski, Elia, and Higgins actions, Mr. Tengood suffered the permanent loss of valuable personal property.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Sicinski, Elia, and Higgins for compensatory damages, punitive damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

### L.  COUNT TWELVE - TRESPASS:

### (DEFENDANTS SICINSKI, ELIA, AND HIGGINS IN THEIR INDIVIDUAL CAPACITIES)

218.    Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph as if fully set forth herein.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Sicinski, Elia, and Higgins for compensatory damages, punitive damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

### M. COUNT THIRTEEN - INVASTION OF PRIVACY:

### (DEFENDANTS SICINSKI, ELIA, AND HIGGINS IN THEIR INDIVIDUAL CAPACITIES)

219.    Mr. Tengood realleges and incorporates by reference the allegations contained in each and every preceding paragraph as if fully set forth herein.

**WHEREFORE**, Plaintiff Steven P. Tengood respectfully prays for judgment, jointly and severally against Defendants Sicinski, Elia, and Higgins for compensatory damages, punitive damages, interest, attorney's fees, the cost of this action, and such other and further relief as this Court shall deem just and appropriate.

## IV. DECLARATION OF GOOD FAITH

220.    Each and every allegation set forth at length in Paragraphs 1 to 219 above is likely

to have evidentiary support after a reasonable opportunity for further investigation or discovery.


Dated: December 2, 2011

                                            Respectfully Submitted,


                                            _____

                                            Joshua Upin
                                            Attorney for Plaintiff
                                            PA I.D. No. 308457

                                            TKS Legal Services
                                            800 N. 2nd Street
                                            PMB # 178
                                            Philadelphia, PA 19123
                                            p: 215-989-4111
                                            f: 215-853-3676
                                            joshua@tkslegalservices.com

# APPENDIX I

## **DSM-IV**

**Diagnostic Criteria for 300.3 Obsessive Compulsive Disorder**

A. Either Obsessions or compulsions:

*Obsessions as defined by (1), (2), (3), and (4):*

(1) recurrent and persistent thoughts, impulses, or images that are experienced, at some time during the disturbance, as intrusive and inappropriate and that cause marked anxiety or distress
(2) the thoughts, impulses, or images are not simply excessive worries about real life problems
(3) the person attempts to ignore or suppress such thoughts, impulses, or images, or to neutralize them with some other thought or action
(4) the person recognizes that the obsessional thoughts, impulses, or images are a product of his or her own mind (not imposed from without as in thought insertion)

*Compulsions as defined by (1) and (2):*

(1) repetitive behaviors (e.g. hand wahsing, ordering, checking) or mental acts (e.g. praying, counting, repeating words silently) that the person feels driven to perform in response to an obsession, or according to the rules that must be applied rigidly
(2) the behavior or mental acts are aimed at preventing or reducing distress or preventing some dreaded event or situation; however, these behaviors or mental acts either are not connected in a realistic way with what they are designed to neutralize or prevent or are clearly excessive

B. At some point during the course of the disorder, the person has recognized that the obsessions or compulsions are excessive or unreasonable.

C. The obsessions or compulsion cause marked distress, are time consuming (take more than 1 hour a day), or significantly interfere with the person's normal routine, occupational (or academic) functioning or usual social activities or relationships.

D. If another Axis I disorder is present, the content of the obsessions or compulsions is not restricted to it...

E. The disturbance is not due to the direct physiological effects of a substance (e.g. a drug of abuse, a medication) or a general medical condition.

*Specify if:*

**With Poor Insight:** if, for most of the time during the current episode, the person does not recognize that the obsessions and compulsions are excessive or unreasonable.

*Source:*   Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, *Text Revision* (4th ed. 2000).

---

## Proposed Amendments and Additions to Forthcoming DSM-V

**Hoarding Disorder**

The work group is recommending that this be included in DSM-5 but is still examining the evidence as to whether inclusion is merited in the main manual or in an Appendix for Further Research.

A. Persistent difficulty discarding or parting with possessions, regardless of the value others may attribute to these possessions. *

B. This difficulty is due to strong urges to save items and/or distress associated with discarding

C.  The symptoms result in the accumulation of a large number of possessions that fill up and clutter active living areas of the home or workplace to the extent that their intended use is no longer possible. If all living areas are uncluttered, it is only because of the interventions of third parties (e.g., family members, cleaners, authorities).

D.  The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning (including maintaining a safe environment for self and others).

E.  The hoarding symptoms are not due to a general medical condition (e.g., brain injury, cerebrovascular disease).

F.  The hoarding symptoms are not restricted to the symptoms of another mental disorder (e.g., hoarding due to obsessions in Obsessive-Compulsive Disorder, decreased energy in Major Depressive Disorder, delusions in Schizophrenia or another Psychotic Disorder, cognitive deficits in Dementia, restricted interests in Autism Spectrum Disorder, food storing in Prader-Willi Syndrome).

*Specify if:*

*With Excessive Acquisition:* If symptoms are accompanied by excessive collecting or buying or stealing of items that are not needed or for which there is no available space.

*Specify whether hoarding beliefs and behaviors are currently characterized by:*

*Good or fair insight:* Recognizes that hoarding-related beliefs and behaviors (pertaining to difficulty discarding items, clutter, or excessive acquisition) are problematic.

*Poor insight:* Mostly convinced that hoarding-related beliefs and behaviors (pertaining to difficulty discarding items, clutter, or excessive acquisition) are not problematic despite evidence to the contrary.

*Absent insight:* Completely convinced that hoarding-related beliefs and behaviors (pertaining to difficulty discarding items, clutter, or excessive acquisition) are not problematic despite evidence to the contrary.

 * The Working Group is considering alternative wording: "Persistent difficulty discarding or parting with possessions, regardless of their actual value."

## RATIONALE

1.   Epidemiological studies suggest that hoarding occurs in 2-5% of the population and can lead to substantial distress and disability, as well as serious public health consequences that warrant consideration as a mental disorder. Most cases do not meet criteria for OCD or OCPD. Accumulating data challenge the current view of a specific relationship between hoarding and OCD/OCPD, and whether these diagnoses cover all the severe hoarding cases.

2.   The creation of a new diagnosis in DSM-5 would likely increase public awareness, improve identification of cases, and stimulate both research and the development of specific treatments for Hoarding Disorder.

3.   Criteria A-E:  The proposed criteria are very similar to previously published criteria, which were based on research and clinical experience and that have been widely adopted by the field since 1996.

4.   Specifiers:

   a. The majority of people with hoarding disorder excessively acquire things either through buying or obtaining free things. However, not everyone with hoarding problems reports excessive acquisition, so including it as a diagnostic criterion would exclude people with true hoarding problems. Since recognition of and intervention for excessive acquisition is crucial for successful treatment of hoarding disorder, it is included as a specifier.

b. Available data suggest that a range of insight can characterize hoarding disorder. The proposed specifiers are similar to those proposed for other disorders, and they appear applicable to hoarding disorder.

## RELATION TO CURRENT DSM-IV-TR

This disorder is not listed in DSM-IV; therefore, DSM-IV criteria for this disorder do not exist.

In DSM-IV, '*the inability to discard worn-out or worthless objects even when they have no sentimental value*' is one of the 8 criteria for Obsessive-Compulsive Personality Disorder (OCPD)

In the text accompanying the OCPD criteria, DSM-IV states:

"*Despite the similarity in names, OCD is usually easily distinguished from OCPD by the presence of true obsessions and compulsions. A diagnosis of OCD should be considered especially when hoarding is extreme (e.g. accumulated stacks of worthless objects present a fire hazard and make it difficult for others to walk through the house). When criteria for both disorders are met, both diagnoses should be recorded*" *(p. 728)*

*Source: DSM-5 Development*, Am. Psychiatric Ass'n, http://www.dsm5.org/ProposedRevision/ Pages/proposedrevision.aspx?rid=398 (last visited Dec. 2, 2011).